UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____23-mj-02365-AOR_____

UNITED STATES OF AMERICA

vs.

DIANA FLETCHER,

    Defendant.
_____/

FILED BY ___ER___ D.C.

Feb 23, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  NO

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?  NO

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:    *Yara Dodin*
     YARA DODIN
     Assistant United States Attorney
     Southern District of Florida
     FL Bar No. 0124979
     99 N.E. 4th Street, 7th Floor
     Miami, Florida  33132
     Tel.:  305-961-9425
     Fax:  305-536-7213
     Email:  yara.dodin@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>DIANA FLETCHER,<br><br>Defendant(s) | ) ) ) ) ) ) ) Case No. 23-mj-02365-AOR |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __August 2018 - September 2019__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §1956(h) and 1956(a)(3)(B) | Conspiracy to launder monetary instruments. |

This criminal complaint is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_Complainant's signature_

Bert Ferguson, Special Agent - FBI
_Printed name and title_

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by __Face Time.__

Date: __2/23/2023__

_Judge's signature_

City and state: __Miami, Florida__     Hon. Alicia M. Otazo-Reyes, United States Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A COMPLAINT

I, Bert S. Ferguson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a Complaint charging DIANA FLETCHER with conspiring to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(3)(B).

2. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since February 2018. I am currently assigned to the Transnational Organized Crime Section. As a Special Agent with the FBI, my duties and responsibilities include investigations and assisting with the prosecutions of individuals involved in complex criminal activity regarding a wide range of federal criminal violations. I am empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18 and Title 21 of United States Code, among other violations.

3. During the course of my duties, I have conducted and participated in investigations involving sophisticated investigative techniques such as surveillance, undercover operations, pen registers and trap/trace devices, and wiretaps. Additionally, I have participated in drafting affidavits and complaints and in planning and executing search warrants and arrest warrants in cases involving various types of fraud and theft.

4. The facts set forth in this affidavit are based on my personal observations, my review of documentary evidence and audio recordings, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for a Complaint and the requested arrest warrant and does not set forth all my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. §§ 1956(h) and 1956(a)(3)(B), laundering of monetary instruments, has been committed by DIANA FLETCHER.

## JURISDICTION

6. This Court has jurisdiction to issue the requested Complaint because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

## EVIDENCE SUPPORTING PROBABLE CAUSE

7. The evidence discussed herein demonstrates probable cause to believe that DIANA FLETCHER knowingly conducted financial transactions involving property that a law enforcement officer represented as coming from a specified unlawful activity (SUA), and that FLETCHER engaged in financial transactions with the intent to conceal and disguise the nature, location, source, ownership, and control of the property believed to be the proceeds of specified unlawful activity. FLETCHER and others conducted at least nine (9) separate financial transactions between in or about August 2018 and in or about September 2019. Each of these financial transactions involved money that undercover law enforcement officers (UCs) told FLETCHER and others working with her had been obtained by engaging in an SUA. FLETCHER and others working with her in turn laundered the funds, in exchange for a fee, by means intended to conceal and disguise the criminal nature of the proceeds. Evidence obtained in support of this application is comprised of audio and/or video recordings, surveillance photographs, text/WhatsApp messages, records obtained pursuant to subpoenas, search warrant returns, and financial records.

**The Defendant and Related Entities and Individuals**

8. FLETCHER resides in Ontario, Canada and possesses a Canadian passport. FLETCHER is the President and co-Founder of Company 1 and one or more of Company 1's subsidiary entities. At times relevant to this investigation, FLETCHER used Company 1 to launder and conceal the illicit proceeds of crimes in exchange for a fee. FLETCHER and her coconspirators laundered illicit proceeds by picking up tainted cash, depositing it into multiple bank accounts, then either wiring the proceeds onto stored value cards ("TruCash cards") or through one or more attorney trust accounts managed and controlled by Attorney 1 ("ATTY1").

9. ATTY1 is an attorney licensed in the state of North Carolina who controlled and managed attorney trust accounts at Wells Fargo banking institutions.

**Summary of the Scheme**

10. The investigation revealed that between approximately August 2018 and September 2019, FLETCHER and others concealed and laundered criminal proceeds for a fee onto TruCash cards issued by Company 1 or through attorney trust accounts controlled and managed by ATTY1.

11. TruCash cards are stored value cards, which are plastic payment cards utilized for purchases similar to a debit card or a credit card. Unlike a debit or credit card however, the monetary value contained on a TruCash card is maintained on the card itself instead of at a financial institution in an external account (*e.g.*, debit cards) or associated with a credit line (*e.g.*, credit cards). Because TruCash cards are not linked to a specific account at a financial institution, the cards can contain significant sums that can be transferred anonymously or transited across borders without being detected.

12. The investigation revealed that as part of the money laundering scheme described herein,

3

FLETCHER caused illicit proceeds to be wired into a "trust account" maintained by an attorney, which served to conceal their unlawful nature and then returned to her client(s) minus her laundering fee.

### Conspiracy to Launder SUA Proceeds through "TruCash" Cards and Wire Transfers from Attorney Trust Accounts

13. From in or around August 2018 through in or around September 2019, FLETCHER offered, for a fee, to convert bulk cash identified as SUA proceeds into balances loaded onto TruCash cards managed by Company 1 or through wire transfers laundered through one or more attorney trust accounts established and managed by ATTY1.

14. During this time, FLETCHER and/or other coconspirators under FLETCHER's direction received funds on nine (9) occasions involving a total of $1,261,000 in bulk cash that UCs identified as SUA proceeds. Each of these meetings and transactions occurred within the Southern District of Florida.

15. In one or more recorded meetings with UCs, FLETCHER described the mechanics of the scheme and advised that she or others would take possession of bulk cash and transport the cash to a U.S. bank for deposit into attorney trust accounts controlled and managed by ATTY1. Once deposited, FLETCHER stated that the funds would either be transferred onto Company 1's TruCash cards, which would be provided to the client, or transferred by wire back to the client. In order to conceal the unlawful nature and source of the funds, FLETCHER discussed using bogus transaction descriptions for the wire transfers. FLETCHER stated that she charged a fee of approximately 3-5% of each deposit in exchange for this service.

16. In recorded meetings with UCs, FLETCHER also described the benefit of using an attorney trust account belonging to and managed by ATTY1, namely, that "[t]he government has no view to it, and there's no visual, and it will always be under the lock."

17. Similarly, FLETCHER described how money wired by Company 1 onto TruCash cards was not traceable, because such cards are not associated with an individual bank account or credit line.

18. After UCs delivered cash that they represented to be proceeds of SUA to FLETCHER or her co-conspirators, FLETCHER caused a significant portion of the funds to be routed through the U.S. banking system and laundered back to the UCs through either TruCash cards or via wire transfers from ATTY1's trust accounts.

Initial Meeting between FLETCHER and Undercover Agents

19. On or about August 29, 2018, an Undercover FBI agent (UCE1) was introduced to FLETCHER. At this meeting, which was recorded, FLETCHER advised that she was in the financial industry and worked with debit, credit, and prepaid cards in Europe, the United States, and Canada. FLETCHER explained the mechanics of the process using either the TruCash cards or attorney trust account(s). FLETCHER then offered to launder bulk cash for UCE1 for a fee of 3% of the amount of each transaction. FLETCHER confirmed that she would travel to pick up the bulk cash personally and then deposit it into the banking system. FLETCHER stated that due to her other legitimate business no one questioned her regarding the transactions. FLETCHER further advised that she would introduce UCE1 to attorneys willing to establish and manage trust accounts and that no questions were asked since the trust accounts were managed by a law firm. FLETCHER said: "It's under a lawyer so no questions are asked. . . . it's even better than [an escrow account]. It's a trust account. So the government has no view to it, and there's no visual,

5

and it will always be under the lock." FLETCHER further stated" "Okay. So if it's you, I suggest you put in on the cards where it's un-trackable."[1]

Transaction #1 (Money Drop of $11,000) – December 27, 2018

20. On or about December 27, 2018, UCE1 met with FLETCHER and her coconspirator, "D.S." At this meeting UCE1 provided $11,000 in bulk cash to FLETCHER and stated that the bulk cash was the proceeds of an illegal gambling operation. (UCE1 said *"this is from a bookmaking off street operation on sports on the street."*) FLETCHER responded *"Yeah, listen, in our business, alls we deal with is crooked people."* FLETCHER agreed to return an equal amount of funds to UCE1 on TruCash cards, minus a fee of 3%. Both FLETCHER and D.S. physically handled the bulk cash during the meeting. FLETCHER said: *"it's coming from a trust account, so there's no questions asked on the trust account."*.

21. On or about January 2, 2019, UCE1 received a package containing five (5) TruCash cards that had been shipped from Company 1 on or about December 28, 2018, one day after UCE1 had delivered $11,000 in cash to FLETCHER and D.S. The TruCash cards collectively carried a total value of $10,670, which represented the sum UCE1 had provided to FLETCHER and D.S., minus a fee of 3%. The words "VIP MEMBER"—but no name—were printed on each card.

22. On or about January 1, 2019, Z.A.O., an employee of Company 1, told UCE1 in a recorded call that she had arranged for the TruCash cards to be loaded with funds for transmission to UCE1, as agreed with FLETCHER.

Transaction #2 (Money Drop of $50,000) – January 16, 2019

23. On or about January 16, 2019, in a meeting that was recorded, UCE1 provided $50,000 in

---

[1] The transcript quotations in this Affidavit are from an unofficial FBI-generated transcript, which I have personally reviewed and believe to be accurate.

bulk cash to FLETCHER and coconspirators, D.S. and Z.A.O., and stated that the bulk cash was the proceeds of MDMA/ecstasy sales. (UCE1: *"I've got a side business, a piece of a Strip Club where they're moving a lot of . . . you would be surprised how much uhm, like MDMA. . . moves through it."*) An FBI-generated transcript of that meeting also contains the following discussion:

> UCE1: So *So, so we'll do, we'll do this fifty, you'll have it wired, wired back in, I'll be ready for to do a hundred next week.*
> DF: *Ok.*
> UCE 1: *Uhm, of the, I'll tell ya, . . . the amount of money made you know, just is MDMA, in the club…*
> DF: *I know, I know*

24. FLETCHER, D.S., and Z.A.O. took possession of the bulk cash and agreed that the bulk cash would be held in D.S.'s hotel room until such time as it could be deposited into the U.S. Banking system.

25. At that time and in the presence of UCE1, FLETCHER contacted N.S., an employee of Company 1, and asked N.S. to arrange a wire transfer in the amount of $50,000 from ATTY1's Wells Fargo trust account, minus a fee of 3% (*i.e.*, $48,500).

26. On or about January 17, 2019, the day after the meeting, $48,500 was transferred via wire from ATTY1's Wells Fargo trust account associated with a subsidiary of Company 1 to a covert bank account controlled by law enforcement agents, details for which UCE1 had provided to FLETCHER. The wire transfer records included a notation that the transfer was a payment "**From DCR Marketing**." At no point during the January 16, 2019 meeting did FLETCHER, D.S., Z.A.O., or UCE1 make any reference to "DCR Marketing" which is a company associated with FLETCHER. Based upon my training and experience, I believe that the notation to a business was intended to disguise the fact that the money represented MDMA proceeds. Bank records disclose that the attorney account from which the money was transferred was entitled "Trust Account for DCR Marketing."

7

Transaction #3 (Money Drop of $100,000) - February 13, 2019

27. On or about February 13, 2019, FLETCHER and UCE1 discussed in a recorded telephone call conducting another financial transaction. During this discussion, FLETCHER advised UCE1 that she was unavailable to meet and that K.D. and J.C. would meet with UCE1 and accept the bulk cash on her behalf. At the subsequent meeting, UCE1 provided $100,000 in bulk cash to K.D. and J.C., as directed by FLETCHER. UCE1 stated that the bulk cash was proceeds of MDMA/ecstasy sales. (". . . one of the businesses that I'm involved in is doin' about . . if you don't mind I speak frankly . . . about a hundred - about a hundred a week just in MDMA sales out of the business. . . are you familiar with MDMA? Ecstasy." To which K.D. replied "Yes, yes, yes ,yes." K.D. and J.C. took possession of the bulk cash. K.D. told UCE1 that he/she would keep the bulk cash in his/her safe deposit box and then discussed MDMA's popularity in South Florida. Law enforcement officers then surveilled K.D. and J.C. returning with the bulk cash to their condominium located in the Southern District of Florida.

28. Following the meeting, UCE1 confirmed in a recorded call with FLETCHER that the sum of $100,000 in bulk cash was provided to coconspirators K.D. and J.C. FLETCHER then advised UCE1 that she would have the money wire transferred to an account as directed by UCE1.

29. On or about February 15, 2019, the sum of $95,000 was transferred via wire from ATTY1's Wells Fargo trust account associated with DCR Marketing into a bank account controlled by law enforcement, which represented the sum of $100,000 provided to FLETCHER, K.D., and J.C., minus a fee of 5%. The wire transfer included the payment detail **"From DCR"** in the description, which, based on my training and experience and my participation in this investigation, I believe was intended to disguise the nature and source of the funds.

<u>Transaction #4 (Money Drop of $100,000) - February 19, 2019</u>

30. On or about February 19, 2019, FLETCHER spoke with UCE1 in a recorded telephone conversation about conducting another transaction and advised UCE1 that K.D. would meet with UCE1 and accept the bulk cash on her behalf again because she was unavailable. At the subsequent meeting, UCE1 provided the sum of $100,000 in bulk cash to coconspirator K.D., as directed by FLETCHER, and stated that the bulk cash was proceeds from the sale of MDMA/ecstasy ("So I wasn't lying when I told ya that the X [X is short for Ecstasy, another name for MDMA] is bringing in a hundred a week.")  K.D. responded "I don't even care – like it's none of my business." UCE1 then provided K.D. with the bulk cash while they were traveling in an automobile between K.D.'s condominium and a restaurant located in the Southern District of Florida.

31. Following the February 19, 2019 meeting, UCE1 confirmed with FLETCHER that UCE1 had delivered $100,000 in cash to K.D. FLETCHER responded that she had to charge a 5% fee—as she had in the prior transaction—in order to pay K.D. 2% for his/her role in the transactions.

32. On or about February 25, 2019, the sum of $95,000 was transferred via wire from a trust account managed and controlled by ATTY1 into a bank account controlled by law enforcement. This amount represented the $100,000 the UC had provided to K.D., at FLETCHER's direction, minus a fee of 5%. The wire transfer included the payment detail **"From DCR Marketing"** in the description, which I believe, based on my training and experience and my participation in this investigation, was intended to disguise the nature and source of the funds.

<u>Transaction #5 (Money Drop of $150,000) - March 5, 2019</u>

33. On or about March 5, 2019, FLETCHER and UCE1 arranged by text-messaging to

9

undertake a transaction involving another undercover law enforcement agent (UCE3),[2] whom UCE1 identified as an associate of UCE1. At the subsequent meeting, UCE3 met with K.D. UCE3 subsequently delivered $150,000 in cash to K.D., as directed by FLETCHER. UCE3 delivered the bulk cash to K.D. outside K.D.'s condominium located in the Southern District of Florida and K.D. then took the cash into the condominium building.

34. Following the meeting, UCE1 confirmed with FLETCHER that $150,000 in cash had been delivered to K.D. FLETCHER stated to UCE1 that she would look after the money and provide the wire transfer to the same covert account associated with UCE1.

35. On or about March 8, 2019, $142,500 was transferred via wire from a trust account managed and controlled by ATTY1 into a covert bank account controlled by law enforcement; this sum represented the $150,000 UCE3 provided to K.D., at FLETCHER's direction, minus a fee of 5%. The wire transfer included the payment detail "**From DCR Marketing**" in the description, which I believe, based on my training and experience and participation in the investigation, was intended to disguise the nature and source of the funds.

36. On or about March 9, 2019, FLETCHER, accompanied by another person, W.G., made a cash deposit of $345,000 at a Wells Fargo branch located in Miami Beach, Florida. I believe that this amount represents the cash that was provided to K.D., serving as an agent for FLETCHER, ($350,000) minus a fee that FLETCHER agreed to pay K.D. The cash was deposited into ATTY1's trust account associated with DCR Marketing. Bank records show that the $345,000 reimbursed the trust account for the funds that ATTY1 had transferred via wire to UCE1's covert account, described above.

---

[2] UCE2 is a second undercover law enforcement agent who accompanied UCE1 to several of the meetings posing as UCE1's spouse. UCE3 is a third law enforcement officer who met with the targets of the investigation in the place of UCE1 and UCE2.

Transaction #6 (Money Drop of $150,000) - March 11, 2019

37. On or about March 11, 2019, FLETCHER and UCE1 arranged a meeting by text messages between UCE3 and FLETCHER, because UCE1 was unavailable. UCE3 subsequently met with FLETCHER and her friend ("ATTY2")[3] at a hotel on South Beach, in the Southern District of Florida. During the meeting, which was recorded, UCE3 handed a bag containing $150,000 in bulk cash to FLETCHER. FLETCHER then handed the bag of bulk cash to ATTY2.

38. Later that day, law enforcement officers observed FLETCHER entering a Wells Fargo branch located in Miami Beach, Florida carrying the same bag. Bank records show that the $145,000 was deposited at that branch into ATTY1's trust account associated with DCR Marketing.

39. On or about March 12, 2019, $142,500 was transferred via wire from ATTY1's Wells Fargo trust account associated with DCR Marketing into a covert bank account controlled by law enforcement, which represented the $150,000 provided to K.D. and ATTY2, minus a fee of 5%. The wire transfer included the payment detail "**From DCR Strategies**" in the description, which I believe, based on my training and experience and my participation in this investigation, was intended to disguise the nature and source of the funds.

40. On the same date, March 12, 2019, UCE1 texted FLETCHER and thanked her for the deposit. FLETCHER responded by text, saying "no problem" and advising that coconspirator Z.A.O. would be available to make weekly deposits after K.D. left South Florida.

Transaction #7 (Money Drop of $150,000) - March 25, 2019

41. On or about March 25, 2019, in a recorded telephone call, FLETCHER and UCE1 arranged

---

[3] ATT2 was introduced to UCE1 and UCE2 as well as to UCE3 as FLETCHER's "friend." ATTY2 is a Canadian attorney who has occasionally accompanied FLETCHER on trips to Miami, and has been present for at least two meetings where money was passed to FLETCHER.

11

a meeting between UCE3 and K.D., because FLETCHER and UCE1 were unavailable. At the subsequent meeting, UCE3 provided $150,000 in bulk cash to K.D., as directed by FLETCHER. UCE3 provided K.D. the bulk cash outside K.D.'s condominium and K.D. was observed taking the bulk cash into the condominium building.

42. Following the meeting, UCE1 confirmed with FLETCHER that the $150,000 in bulk cash was provided to K.D. FLETCHER advised she would facilitate a wire transfer the next day.

43. On or about March 29, 2019, $142,500 was transferred via wire from ATTY1's Wells Fargo trust account associated with DCR Marketing into a covert bank account controlled by law enforcement, which represented the $150,000 provided to FLETCHER and ATTY2, minus a fee of 5%. The wire transfer included the payment detail "**From DCR**" in the description, which I believe, based on my training and experience and my participation in this investigation, was intended to disguise the nature and source of the funds.

Transaction #8 (Money Drop of $250,000) - April 29, 2019

44. On or about April 29, 2019, FLETCHER and UCE1 discussed conducting another transaction in a recorded telephone call. FLETCHER advised UCE1 that W.G., described as an employee, would meet with UCE1 and accept the bulk cash on her behalf, as she wanted to limit her exposure because she was attracting too much attention as a result of problems she had encountered in Canada. ("I'm trying to do[draw] less attention. . . I have a lot of attention at all times on me, like you probably.")  At the subsequent meeting, on April 29, 2019, UCE1 provided $250,000 in bulk cash to W.G., as directed by FLETCHER. UCE1 provided W.G. with the bulk cash during a recorded meeting in an automobile while traveling from a restaurant to W.G.'s hotel, located in the Southern District of Florida. W.G. advised UCE1, among other things, that he/she

assisted FLETCHER with bank regulation and compliance issues and worked with her all over the world.

45. Upon leaving the restaurant, W.G. indicated that he/she had assisted FLETCHER with UCE1's bulk cash transaction approximately one (1) month earlier. W.G. advised that they had a special relationship with a bank manager at a Wells Fargo in Miami, who permitted them to make large cash deposits.

46. According to bank records and surveillance photos, W.G. deposited $245,000 in cash at a Wells Fargo branch located in Illinois on or about May 15, 2019. Bank records show that the cash was deposited into ATTY1's trust account associated with TCA Managers. TCA Managers is a business controlled by FLETCHER and associated with DCR Marketing.[4]

47. The funds were subsequently transferred via wire into a covert bank account controlled by law enforcement via three (3) separate wire transfers. On or about May 16, 2019, $142,500 was transferred from ATTY1's Wells Fargo trust account associated with TCA Managers into a covert bank account controlled by law enforcement. On or about May 22, 2019, $50,000 was transferred from ATTY1's Wells Fargo trust account associated with TCA Managers into the covert bank account. On or about May 24, 2019, the remaining $45,000 was transferred from ATTY1's Wells Fargo trust account associated with TCA Managers into the covert bank account, which in total represented the $250,000 UCE1 had provided to W.G., at FLETCHER's direction, minus a fee of 5%. In each instance, the wire transfer included the payment detail "**From TCA**" in the description, which I believe, based on my training and experience and my participation in this investigation, was intended to disguise the nature and source of the funds.

---

[4] Text messages obtained in the investigation show that, on several occasions, ATTY1 is directed by FLETCHER to pay expenses for DCR from the Trust Acct for TCA Managers. This is one such occasion.

13

Transaction #9 (Money Drop of $300,000) - August 29, 2019

48. On or about August 29, 2019, UCE1 provided $300,000 in bulk cash to FLETCHER during a recorded meeting on a boat with FLETCHER and ATTY2. UCE1 provided FLETCHER the cash toward the end of their meeting. FLETCHER advised UCE1 that she would deposit the bulk cash into the Wells Fargo bank account the next morning.

49. During the meeting, FLETCHER explained the process of laundering UCE1's bulk cash through Wells Fargo trust accounts established and managed by ATTY1. FLETCHER said: *like I tend to be gray, right? And, and, and, and, but I think it's exciting because you break the banking system a little bit. . .. Don't tell me I'm money laundering, okay? You get those sons of bitches, right? They're the ones that are, how many, okay, I said to* [the UCE1], *like the three hundred thousand dollars you know? I said, how many dollars are they* [Walmart and CVS] *getting out on a daily basis? But, they're not getting KYC, so you still have no idea who's dropping this money off. . . "*

50. FLETCHER explained that UCE1 did not have to worry about Currency Transaction Reports since the trust accounts were managed by a law firm.("UCE1 – *So I don't have to worry about . . . CTRs and stuff like that?* DF: *Nothing. I mean, you don't even have to do anything. So what you do is, because it's a legal account . . .. it's Trust account, it's a Law Firm account.*"). UCE1: *This stuff, I mean, but the, I'm new to the trust account thing. So, and it's got me interested. I mean, so everything's basically insulated because of this attorney. . . Alright, so because it's a trust, and because he manages it, there's no, there's no issues, there's no ties?* DF responded: *No questions asked, right.*

51. Further, in response to a concern UCE1 expressed regarding the recent wire transfers from

14

TCA Managers, FLETCHER explained that she could generate business records (e.g., invoices) that would appear to explain the transfers from the new account and that TCA was another trust account she controlled at ATTY1's law firm. UCE1 said: *[My bookkeeper] said, what is TCA? And I said, I don't fuckin' know what TCA is. He says, well the last wire came from TCA. And he says, I need something to justify what TCA is on the books.*" FLETCHER replied: "*Well what I can do is, I can actually give you invoices, uh or visa versa, uh you can give me invoices, um and I can be paying your invoices. We can be doing like that,*"

## CONCLUSION

52. Based on the foregoing, I respectfully submit that there is probable cause to believe that FLETCHER has engaged in a conspiracy to launder monetary instruments, a violation of 18 U.S.C. § 1956(h) – having the purpose of violating 18 U.S.C. §1956(a)(3)(B) -- conducting a financial transaction involving property represented to be the proceeds of a specified unlawful activity, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property believed to be the proceed of specified unlawful activity.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Bert Ferguson
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1
by Face Time this __23rd__ day of February 2023.

HONORABLE ALICIA M. OTAZO–REYES
UNITED STATES MAGISTRATE JUDGE

15